## Commonwealth v. Erie Excavating & Grading Co.

*John M. Wolford, Robert A. Mills* and *Richard C. Fox*, for appellant.

*William C. Sennett*, Attorney General, and *Vincent X. Yakowicz*, Deputy Attorney General, for Commonwealth.

BOWMAN, J., May 1, 1967.—This is an appeal from an order of the Board of Finance and Revenue in proceedings under the Tax Act of 1963 for Education [1] denying appellant's petition for review of a use tax assessment against appellant.

A written agreement to waive a jury trial has been filed by the parties as provided by the Act of April 22, 1874, P. L. 109, 12 PS §688; and they have stipulated a substantial number of facts which we adopt and some of which we will refer to in the course of this opinion. Additional evidence was taken at a hearing, but we do not deem such evidence to have produced any facts essential to a determination of the issues here raised, and we make no findings of fact based upon such evidence.

This appeal is before us as a result of a use tax assessment being made by the taxing authorities against appellant in connection with its use of tangible personal property in the performance of a construction contract.

Appellant, a Pennsylvania corporation, entered into the contract in question with the United States of America acting through the United States Corps of Army Engineers for the construction of a railroad roadbed with structures and bridges. Such construction was necessitated because of the anticipated flooding of an existing roadbed of the Erie Railroad Company which would result upon completion of the Shen-

---

[1] Act of May 29, 1963, P. L. 49, formerly known as the Selective Sales and Use Tax Act of March 6, 1956, P. L. (1955) 1228, as amended.

ango River Reservoir Project of the Army Corps of Engineers, and by reason of an agreement that had been entered into between the Erie Railroad Company and the Army Corps of Engineers, that the latter would relocate the affected roadbed at its expense in consideration of the railroad company's waiving damages.

The construction of the project was at the direct expense of the Army Corps of Engineers. At all relevant times in question, the materials upon which the tax was assessed were utilized in the performance of the contract by appellant for the Army Corps of Engineers which owned the property upon which the construction contract was being performed and the materials in question when incorporated into the construction.

Upon completion of the contract, the work was accepted by the Army Corps of Engineers in accordance with its contract with appellant, and thereafter, the project was turned over to the Erie Railroad Company, which presently utilizes it for the transportation of persons and property as a common carrier.

As part of the change in its right of way from that portion to be flooded by the Shenango River Reservoir Project to that relocated under its agreement with the Army Corps of Engineers, the Erie Railroad Company, prior to taking over the relocated roadbed structures and bridges, obtained various orders from the Pennsylvania Public Utility Commission authorizing sundry actions relating to this change.

Neither appellant nor the Army Corps of Engineers is a public utility. The Erie Railroad Company is a public utility.

Appellant has exhausted its procedural rights and remedies before the appropriate administrative agencies and, by timely appeal to this court, seeks to have the use tax assessment and resulting interest charge declared null and void.

In doing so, it raises the narrow issue of whether

the so called "public utility exclusion" contained in the taxing statute is applicable to materials used in a construction project when the project does not become part of a public utility facility until after its completion.

Section 201(b) of the Act of March 6, 1956, P. L. (1955) 1228, as amended, imposes a tax upon ". . . the use . . . within this Commonwealth of tangible personal property purchased at retail. . . .",[2] and section 2(n)(4)(c), after defining "use", then further provides that the term "use" shall not include:

"The use or consumption of tangible personal property including, but not limited to machinery and equipment and parts and foundations therefor, . . . .

"(iii) . . . in constructing, reconstructing, remodeling, repairing or maintaining the facilities used in such [a public utility] service, . . . ."[3]

This particular statutory exclusion from taxation has been the subject of a number of opinions of this court and of our Supreme Court.

In Commonwealth v. McHugh, 406 Pa. 566 (1962), our Supreme Court held that materials used in the construction of new public utility facilities, as well as those used in the repair or improvement of existing facilities, were within the exclusion from taxation. In reaching this conclusion, it stated, page 570:

"Nor are we persuaded that the words of the statute, 'the facilities used in such service,' connote that the facilities involved have to be already in actual use in order to come within the legislative meaning and tax exclusion. In our opinion, 'used in such service' is descriptive of the purpose for which the materials or tangible property is used and, is not restrictive to the time of use"; and further, page 571:

"Without auxiliary verbs, or other words, indicating

[2] 72 PS §3403-201(b).

[3] Section 2(n)(4)(c)(iii), as amended, 72 PS §3403-2.

past, present or future tense, the word 'used' is a participial adjective which has no fixed meaning in terms of time. See Webster's New International Dictionary (2d Ed. 1959). Standing alone, 'used' can sound in the past, present or future tense".

This decision was followed by that of Commonwealth v. Equitable Gas Company, 415 Pa. 113 (1964), wherein the court was concerned with the meaning of the word "service" as contained in the exclusionary language. In concluding that a public utility is not subject to the sales or use tax on its purchase or use of gas meters installed at customers' premises, in that such devices were necessary to the rendering of the required service consistent with applicable regulations, it was held, pages 116-17:

"We are not here presented with statutory language which requires either a search for legislative intention or the application of rules of statutory construction. The public utility service language is clear and unmistakable. The Legislature has classified not only the public utility property uses excluded from taxation, but also the property upon which the tax is imposed. The determinative inquiry here is whether meters are used in the direct operational function of rendering a public utility service or whether the property is utilized in the nonoperational ('managerial sales') activities.

"Although 'public utility service' is not defined in the Act (and there appears no reason why the Legislature should engage in repetitive definition of an already well understood term), there is no uncertainty as to what it embraces. The Legislature, in the Public Utility Law, defines 'service' as being used 'in its broadest and most inclusive sense, and includes any and all acts done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities . . . in the performance of their duties under this act to their

patrons . . . and the public. . . .' Act of May 28, 1937, P. L. 1053, Section 2(20), as amended, 66 P. S. §1102(20).

"The absence of a definition of 'public utility service' in the Sales and Use Tax Act is a positive indication that the Legislature did not wish to disturb the categorization of service already established by statutory enactments, the Public Utility Commission and decisional authorities. The character of such service remains precisely as it was prior to this Act".

This decision was considered controlling by our court in Commonwealth v. Lafferty, 84 Dauph. 190 (1965), exceptions dismissed, 86 Dauph. 107 (1966),[4] in which it was held that services performed by a contract carrier by motor vehicle were not a public utility service within the meaning of the exclusionary language in question, inasmuch as a contract carrier is not a public utility as defined by the Public Utility Law of May 28, 1937, P. L. 1053, as amended, even though its business is affected by the public interest subjecting it to regulatory action and its services were similar to services performed by public utilities.

In Commonwealth v. Public Constructors, Inc., 85 Dauph. 281 (1966),[4] we recently concluded that the public utility exclusion was not available with respect to materials used in the construction of runways at an airport which was owned and operated by a municipal authority which was not a public utility. We said, pages 283-85:

"The public exemption, as interpreted by Commonwealth v. McHugh, Appellant, 406 Pa. 566 (1962), only extends to contracts performed for a public utility. . . .

"The runways were constructed by the appellant pursuant to contracts it had with the owners of the

---

[4] Presently on appeal to the Pennsylvania Supreme Court.

respective airports and not with the air carriers who concededly are engaged in a public utility service. Upon completion of the work by the appellant, the acceptance or rejection of the work was solely the responsibility of the owners. The appellant was accountable only to the owners of the airports and it relied solely on such owners for payment.

"The fact that, upon completion, air carriers would use the runways constructed by the appellant in nowise alters the fact that the construction of the runways was not for a public utility.

"The appellant contends that the service of transporting passengers and freight by air carrier is a public utility service and the runways are facilities used directly in the rendering of that service, and that section 2(n)'(4)'(c)(iii) of the Act is for application in the instant case. With this contention we cannot agree.

"The term 'public utility service' is not defined in the Act. The absence of such a definition is a positive indication that the legislature did not wish to disturb the categorization of service already established by statutory enactments, the Public Utility Commission and decisional authorities. The character of such service remains precisely as it was prior to the Act, Commonwealth v. Equitable Gas Company, Appellant, and Commonwealth v. United Gas Improvement Company, Appellant, 415 Pa. 113 (1964).

"Section 2(10) of the Public Utility Law, supra, defines the term facilities as follows:

" '(10) "Facilities" means all the plant and equipment of a public utility, including all tangible and intangible real and personal property without limitation, and any and all means and instrumentalities in any manner owned, operated, leased, licensed, used, controlled, furnished, or supplied for, by, or in connection with, the business of any public utility: . . . .'

"There is no reference in the stipulation of facts as

to the terms and conditions of any contracts entered into by the owners of the airports and the air carriers for the use of the runways by the air carriers. We must, therefore, conclude that the air carrier or air carriers did not have the use of the runways to the exclusion of private non-air carrier planes contracting for the use of the runways. . . .

"Accordingly, we conclude that the materials upon which the tax was assessed were not used in 'producing, delivering or rendering of a public utility service, or in constructing . . . the facilities used in such service' ".

If we are to literally apply our pronouncement in Public Constructors that the exclusion in question "only extends to contracts performed for a public utility", then, of course, this appeal must be denied, as the contract in question was performed for a governmental agency. And we add that such a conclusion is in nowise altered by the fact that upon completion the runways would be used by air carriers (public utilities).

On the other hand, after completion of construction, the use to which the runways were put in Public Constructors involved a mixed use by air carriers and private planes, i.e., a nonexclusive use by common carriers, a fact which we recognized in that case in reaching our decision. Should the exclusive use by a public utility of the facilities following the completion of the construction contract—which is the fact of this case—alter the result and bring the use of materials in constructing such facilities within the exclusion as being used ". . . in constructing, reconstructing . . . the facilities used in such [a public utility] service . . ."?

In McHugh, it was held that the phrase "facilities used in such [a public utility] service" is merely descriptive of the *purposes* for which the material is used and is not restrictive to time of use as to past, present or future. Thus, it can be said in the present case that

the necessary time lapse between completion of construction of the railroad facility in question and its ultimate acceptance by the railroad company under the terms of its agreement with the governmental agency is not a controlling factor requiring us, for this reason alone, to negate the applicability of the exclusionary language. It is also uncontested that the ultimate purpose to which the completed facility would be put— and at the present time is in fact being used—is a public utility service, i.e., in a "service", as construed in Equitable Gas and by a "public utility", as construed in Lafferty.

Therefore, the application of the exclusionary language as interpreted by these decisions to the facts of this case demonstrates the use of materials (otherwise taxable) in the construction of a facility which at some time after completion would be used in a public utility service.

But the Commonwealth, while conceding this factual result, insists that this exclusion from taxation necessarily carries with it a limitation extending it to only contracts performed for a public utility.

To reach this conclusion, the Commonwealth argues that at the time the materials in question were used— which is the time the incidence of taxation is fixed— it was prior to the vestiture of title to or ownership of the facility by a public utility (the railroad company), and at a time when there was at most a contract right in the railroad company to acquire title or ownership from a nonpublic utility (the governmental agency). It points out that it would be highly speculative (except by hindsight) to assume future use of a facility for a public utility service where a nonpublic utility is a party to the construction contract under which the facility is being built.

By way of example, the Commonwealth suggests that it would have been possible in this case for the govern-

mental agency and the railroad company, prior to the actual fulfillment of their then existing contract rights and duties, to alter same by providing for vestiture of title to the facility in a land holding company or similar entity not qualifying as a public utility, and thus wholly frustrating the legislative intent in granting the exclusion from taxation in question.

We cannot agree with the Commonwealth's position, inasmuch as we do not believe the exclusionary language in question can be construed to absolutely require that a public utility be a party to the construction contract under which a facility is being built. Where the use to which a facility will be put is by contractual commitment destined upon completion to be used by a public utility in a "public utility service", as that phrase has been interpreted by prior decisions of this court and our Supreme Court, we believe the plain words of the statute preclude an implied limitation that a public utility must be a party to the construction contract under which the facility is being built.

As stated in McHugh, "used in such service" is descriptive of the purpose of the use and it is this purpose, i.e., a "public utility service" which controls the application of the exclusion. In the instant case, the facility was designed for use in a public utility service, was contracted to be constructed solely for use in a public utility service, and the contractual commitments by and among the interested parties lent reasonable certainty to the ultimate use of the facility to the purposes for which it was designed and constructed. In such cases, we think the exclusionary language is applicable by its own terms and without implied limitation.

In reaching this conclusion, we cannot agree with the Commonwealth that it would be highly speculative (except by hindsight) to assume future use of the

facility in question in a public utility service. A realistic examination of the contractual commitments by and among the interested parties evidences a high degree of certainty for use of the facilities in such a service. It would appear to us that it would be more speculative to reach a contrary conclusion that by some means—such as altering their contract commitments—the exclusion from taxation could be improperly gained. Nor do we believe that the Commonwealth is completely without remedy if such an event did occur. It could then assert tax liability against the construction contractor.

For the foregoing reasons, we make the following conclusions of law and order:

CONCLUSIONS OF LAW

1. The materials used by appellant in the construction of the facility in question are not subject to tax under section 201(b) of the Tax Act of 1963 for Education, as they were used in the construction of a facility for use in a public utility service as defined by section 2(n) (4) (c) (iii) of said act.

2. Section 2(n) (4) (c) (iii) of said act does not contain an implied condition that a public utility must be a party to the contract by which a public utility service facility is constructed, if by contractual commitment it is reasonably certain that the facility when constructed will be used for the purpose of a public utility service.

3. The refusal of the Board of Finance and Revenue to grant appellant relief from the assessment of use tax made against appellant by the Bureau of Sales and Use Tax of the Department of Revenue, together with interest thereon, was improper and unlawful.

ORDER

And now, May 1, 1967, the taxpayer's appeal is hereby sustained and, as stipulated by the parties as to

taxpayer's liability depending upon determination of the legal issue involved, it is hereby directed that judgment shall be entered against appellant and in favor of the Commonwealth in the amount of $546.93 for sales tax and $2,956.33 for use tax with appropriate interest as permitted by law, and thereupon marked satisfied of record as having been paid, unless exceptions be filed to this order within 30 days hereof. The prothonotary shall forthwith notify the parties hereto or their counsel of this order.